CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 18 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **LAMONT O. DOUGLAS,** | ) | **Civil Action No. 7:11-cv-00468** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **GENE JOHNSON, et al.,** | ) | **By:  Hon. Jackson L. Kiser** |
| **Defendants.** | ) | **Senior United States District Judge** |

Lamont O. Douglas, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants Gene Johnson, former Director of the Virginia Department of Corrections ("VDOC"); Harold Clarke, current Director of the VDOC; John Garman, a VDOC Regional Director; Tracy Ray, former Warden of the Red Onion State Prison ("ROSP"); Richard Rowlette, former Assistant Warden of the ROSP; Q. Reynolds, a ROSP Treatment Program Supervisor; and ROSP Correctional Officers Captain Kevin McCoy, Captain Dwayne Turner, Lieutenant Delmar Tate, Sergeant Chris Gilbert, and Sergeant Wilbur Wright. Plaintiff alleges that defendants unreasonably search and seize him, cause cruel and unusual punishment, and deny him equal protection, in violation of the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, respectively. Douglas seeks declaratory relief, damages, and injunctive relief. Defendants filed a motion for summary judgment, arguing, inter alia, qualified immunity, and plaintiff responded by asking for discovery and access to his personal property. After viewing the record in a light more favorable to plaintiff, I deny defendants' motion for summary judgment as to plaintiff's Fourth Amendment claims of bystander liability against Turner, Tate, Gilbert, and Wright for strip searches with female staff present and grant the motion as to all other claims and defendants.

Plaintiff was housed at ROSP, a Level-S correctional facility, between December 1998 and August 1999 and between April 2003 and January 5, 2012.[1] Plaintiff was assigned to ROSP's B-3 pod on February 2, 2011, based on the frequency, severity, and trend of his misconduct in VDOC institutions.[2] Inmates assigned to B-3 experience increased security compared to other Level-S inmates at ROSP. For example, in ROSP's standard administrative segregation, correctional officers conduct visual strip searches of inmates through the cell doors' slender windows, which hinder staff from completely viewing the inmate and his cell.[3] In B-3, correctional officers conduct visual strip searches of inmates inside their cells and again outside their cells in a strip search cage in the "public" area of the pod so multiple officers can observe the search unobstructed.[4] In standard administrative segregation, inmates keep extra clothes in

---

[1] ROSP is considered an "Administrative Long Term Segregation Unit," meaning that its inmates, except for the cadre-inmate staff, are kept in their cells for approximately 23 hours per day. This type of secure housing is designed for the VDOC's most violent or defiant inmates.

[2] For example, plaintiff admittedly stabbed a correctional officer seven times in August 1999 that required emergency surgery to the officer's ribs, abdomen, chest, and arms. Douglas v. Meade, No. 2:01-cv-70327, slip op. at 2, 6 (W.D. Va. Apr. 10, 2003) (Jones, J.). See Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); In Re Katrina Canal Breaches Consol. Litig., 533 F. Supp. 2d 615, 631-33 & nn.14-15 (E.D. La. 2008) (collecting cases indicating that federal courts may take judicial notice of governmental websites, including court records); Williams v. Long, 585 F. Supp. 2d 679, 686-88 & n.4 (D. Md. 2008) (collecting cases indicating that postings on government websites are inherently authentic or self-authenticating). Although plaintiff argues that he was never found guilty of the stabbing and that the attack should not be used against him in determining his VDOC security level, the court awarded the officer a $250,000 judgment against plaintiff for the attack. Plaintiff also admits receiving an institutional infraction in B-3 for being naked in his cell while in the presence of a female correctional officer during her patrol. (Am. Compl. ¶ 73.) Additionally, plaintiff filed an affidavit of another inmate who avers hearing plaintiff admit to throwing feces at a correctional officer. (Osbourne Aff. (ECF no. 1-1) ¶ 8.)

[3] The visual strip search procedure used in B-3's strip-search cage was the same visual strip search procedure used inside a cell. The inmate strips and spreads his legs, bends over, spreads his buttocks, squats and coughs, and raises his arms, penis, and scrotum while the officers look at the inmate's head, hair, mouth, torso, pelvic area, legs and feet. The inmate receives his clothing when the inspection is complete. I refer to these visual strip search procedures as a "strip search."

[4] Plaintiff's diagram of the "Shakedown Cage in Public Area" shows a wire cage 4 feet long by 5 feet wide and 8 feet tall that has the back side against a solid wall. (Diagram (ECF no. 1-2) 1.) The front and left side of the cage consists of wire mesh, which allows one officer standing in front of the cage and one officer to the left of the cage to clearly see the inmate. Notably, plaintiff acknowledges that the right side of the cage, which faces toward the control tower where female correctional officers allegedly work, is solid and painted black from the middle of the

their cells, but B-3 inmates may not. Standard administrative segregation inmates are in individual cages adjacent to each other during recreation, but B-3 inmates are in individual cages far away from other inmates. Standard administrative segregation inmates may have a television in their cells, but B-3 inmates may only watch television projected on the pod wall. Standard administrative segregation inmates are escorted to the showers and back to their cells, but B-3 inmates are strip searched before being returning to their cells. All Level-S ROSP inmates, including B-3 inmates, are prevented from leaving their cells to participate in group religious programming and have similar opportunities for showers and recreation.

Plaintiff alleges that defendants Ray, Rowlette, Reynolds, McCoy, Turner, and Tate violated the Equal Protection Clause on February 2, 2011, by assigning plaintiff to B-3 and treating him differently than other Level-S inmates at ROSP. Plaintiff cites as disparate treatment the strip searches in the cage; having solid cell doors; being shaved only once a week with used shaving tools; having toilets that only officers can flush; moving in ambulatory restraints to multiple cells more than once a month; being forced to kneel in showers, recreation cages, and the strip search cage; being alone in the recreation cages and shower; eating Diet Loaf; smelling unpleasant odors; not having a personal television, shelf, desk and electricity in B-3 cells, and not attending group religious programming.

Plaintiff also alleges that he was assigned to segregation at ROSP since August 22, 1999, for institutional charges of which he was later acquitted. Plaintiff argues that these false institutional charges prevent him from earning good time credit, and he concludes that B-3's

---

cage down to the floor. Plaintiff acknowledges that he is clothed when escorted to the strip-cell cage and disrobes inside the cage. (Am. Compl. ¶ 56.)

conditions and his "indefinite assignment" to segregation until he becomes an informant violate the Eighth Amendment.

Plaintiff further alleges that his strip searches are videotaped and broadcast outside the B-3 pod on a password-protected network and that male and female staff saw him during strip searches. Plaintiff concludes that these strip searches violate the Fourth Amendment.

## II.

On January 4, 2012, a ROSP property officer told plaintiff that he would be transferred from ROSP to Sussex I, a Level 5 VDOC facility, for medical reasons. The property officer explained that plaintiff could forego medical treatment and remain at ROSP with his legal research and personal property, but plaintiff chose to go to Sussex I without his personal property.

Plaintiff now requests a court order to compel defendants to transfer his legal research and personal property to him at Sussex I. Plaintiff alleges that he cannot present facts essential to justify opposition to defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56(d), because he does not have personal property, including statute books and case law. Plaintiff also argues that he needs to conduct discovery, including interrogatories and requests for admissions from defendants and affidavits from VDOC inmates about prison life unrelated to the instant claims.

Defendants raise the defense of qualified immunity in support their motion for summary judgment. "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (internal quotation marks omitted). "The privilege is 'an immunity from suit rather than a mere defense to liability. . . .'" Id. (quoting Mitchell v. Forsyth,

472 U.S. 511, 526 (1985)). "The protection of qualified immunity gives officials 'a right . . . to avoid the burdens of 'such pretrial matters as discovery.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001) (quoting Behrens v. Pelletier, 516 U.S. 299, 308 (1996)). Thus, I must initially determine that qualified immunity does not apply before permitting discovery. Id.

To the extent plaintiff asks me to defer ruling on qualified immunity until such time he can access his personal property, I deny the request. I am determining whether plaintiff's version of events as stated in the Amended Complaint state a constitutional violation, which requires me to assume plaintiff's facts as true, and thus, none of the relevant facts are exclusively in the control of defendants. See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 246-47 (4th Cir. 2002) ("[S]ufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party.") Plaintiff does not allege that he is incapable of conducting legal research at Sussex I, and plaintiff's preference to not do more legal research is not a sufficient basis to invoke Rule 56(d). See Strag v. Bd. of Trustees, 55 F.3d 943, 953-54 (4th Cir. 1995) (finding that district court did not abuse its discretion in denying Rule 56(d) relief where the moving party did not specifically allege why the information sought would have been sufficient to create a genuine issue of material fact). Consequently, I will first determine whether plaintiff's version of events states a constitutional violation and whether defendants are entitled to qualified immunity before authorizing discovery.[5] See Lescs v. Martinsburg Police Dep't, 138 F. App'x 562, 564 (4th Cir. 2005) (unpublished) (citing Harlow

---

[5] Although defendants argue that plaintiff failed to exhaust administrative remedies for several claims, it is more appropriate to first resolve defendants' qualified immunity arguments. Qualified immunity resolves most of the claims without the need for discovery whereas resolving exhaustion may necessitate additional discovery. See 42 U.S.C. § 1997e(c) (permitting a court to resolve claims that, inter alia, seek monetary relief from a defendant who is immune without first requiring exhaustion of administrative remedies).

v. Fitzgerald, 457 U.S. 800, 817-18 (1982), and Harrods Ltd., 302 F.3d at 245-46) (recognizing that a district court does not abuse its discretion by adjudicating qualified immunity before authorizing discovery).

### III.

Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

A. THE STATUTE OF LIMITATIONS BARS CLAIMS THAT ACCRUED BEFORE SEPTEMBER 29, 2009.

Section 1983 adopts the statute of limitations that the forum state uses for general personal injury cases. Owens v. Okure, 488 U.S. 235, 249-50 (1989). Virginia's applicable statute of limitations for § 1983 actions is two years and may be tolled. See VA. CODE §§ 8.01-229, -243(A); Wade v. Danek Med., Inc., 182 F.3d 281, 289 (4th Cir. 1999) (holding Virginia's rules regarding equitable tolling apply when Virginia's statute of limitations applies). However, federal law itself governs the question of when a cause of action accrues. Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). A federal cause of action accrues when "the plaintiff has 'a complete and present cause of action'" or when the plaintiff "can file suit and obtain relief." Bay

Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997).

Plaintiff filed this § 1983 action by depositing the Complaint in the prison mailing system on September 29, 2011. See Houston v. Lack, 487 U.S. 266, 275 (1988) (describing the prison-mailbox rule). Thus, any claim that accrued before September 29, 2009, such as fraudulent institutional charges and plaintiff's assignment to segregation in 1999, is barred by the 2-year statute of limitations, and no basis to toll the limitations period appears in the record. Accordingly, defendants are entitled to qualified immunity for any claim accruing before September 29, 2009.

B. DEFENDANTS' STATEMENTS OR THEIR ALLEGED FAILURES TO COMPLY WITH VIRGINIA LAWS OR POLICIES DO NOT FORM A BASIS FOR § 1983 RELIEF.

Plaintiff alleges throughout the Amended Complaint that prison officials spoke disrespectfully to him and failed to follow their own policies. A claim that prison officials have not followed a state's laws, policies, or procedures does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue). When a defendant makes comments that may constitute verbal abuse or harassment, those comments alone do not rise to the level of an Eighth Amendment violation. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979), cited favorably in, Moody v. Grove, 885 F.2d 865 (4th Cir. 1989) (table) (unpublished) (stating as a general rule that verbal abuse of inmates by guards, without more, does not state a constitutional claim); Morrison v. Martin, 755 F.Supp. 683, 687 (E.D.N.C. 1990) (same). The Constitution does not "protect against all intrusions on

one's peace of mind." Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991). Verbal harassment and

idle threats to an inmate, even to an extent that it causes an inmate fear or emotional anxiety, do

not constitute an invasion of any identified liberty interest. See, e.g., Emmons v. McLaughlin,

874 F.2d 351, 354 (6th Cir. 1989) (stating verbal threats causing fear for plaintiff's life are not an

infringement of a constitutional right). The law is clear that mere "threatening language and

gestures of [a] penal officer do not, even if true, constitute constitutional violations." Fisher v.

Woodson, 373 F. Supp. 970, 973 (E.D. Va. 1973). Accordingly, defendants are entitled to

qualified immunity for these claims.

## C. PLAINTIFF DOES NOT DESCRIBE A VIOLATION OF THE FOURTEENTH AMENDMENT.

Plaintiff alleges that Clarke, Johnson, Garman, Ray, Rowlette, Reynolds, McCoy, Turner,

and Tate violated the right to equal protection by treating him differently in B-3 than other

Level-S inmates at ROSP who were not in B-3. The Equal Protection Clause of the Fourteenth

Amendment provides that a state may not "deny to any person within its jurisdiction the equal

protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause . . . is

essentially a direction that all persons similarly situated should be treated alike." City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Sylvia Dev. Corp. v. Calvert Cnty.,

48 F.3d 810, 818 (4th Cir. 1995). To state an equal protection violation, a plaintiff must allege

facts indicating that: (1) plaintiff and a similarly situated, comparator inmate were treated

differently, and (2) that the different treatment was the result of intentional discrimination.

Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 265 (1977); Veney v. Wyche,

293 F.3d 726, 730 (4th Cir. 2002). See United Black Firefighters of Norfolk v. Hirst, 604 F.2d

844, 847 (4th Cir. 1979) (recognizing conclusory allegations of discrimination not supported by

any reference to particular acts, practices, or policies are insufficient to state a claim of

8

discrimination under § 1983). If a plaintiff makes this showing, a defendant must establish that the alleged disparate treatment is "'reasonably related to legitimate penological interests.'" Shaw v. Murphy, 532 U.S. 223, 225 (2001) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

Plaintiff's equal protection claim must fail because he experienced the same conditions of confinement in B-3 as other comparator inmates in B-3. "[F]or purposes of imprisonment and parole, 'the class to which [an inmate] belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject.'" Moss v. Clark, 886 F.2d 686, 691 (4th Cir. 1989) (quoting Koyce v. United States Bd. of Parole, 113 U.S. App. D.C. 152, 306 F.2d 759, 762 (D.C. Cir. 1962)). See also Refitt v. Nixon, 917 F. Supp. 409, 413 (E.D. Va. 1996) ("[I]n light of the myriad of factors involved in a parole decision, it is difficult to believe that two prisoners could ever be considered similarly situated for purposes of judicial review of an equal protection claim.") (internal quotations omitted). Plaintiff's equal protection claim would also fail even if the comparator inmates included all Level-S inmates at ROSP. B-3 inmates receive the same treatment as other Level-S inmates at ROSP except they are subject to strip searches in a strip cage inside the pod, including when escorted from the shower back to a cell; are held in recreation cages not adjoining another inmate; do not have individual televisions; and wear different colored clothes. Prison officials determined that Level-S inmates who are assigned to B-3, like plaintiff, are more disruptive and exhibit more behavioral problems than other Level-S inmates, and thus, the additional security measures used for B-3 inmates serve legitimate penological interests of safety, security, and rehabilitation. See Procunier v. Martinez, 416 U.S. 396, 413 (1974) (recognizing security, order, and rehabilitation are legitimate penological interests), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989); Veney, 293 F.3d at 732-33 (recognizing the necessary deference to prison safety and

9

security).  Accordingly, defendants are entitled to qualified immunity for plaintiff's equal protection claims.

D.  PLAINTIFF DOES NOT DESCRIBE A VIOLATION OF THE EIGHTH AMENDMENT.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment's prohibition on cruel and unusual punishment requires that prison officials provide humane conditions of confinement.  Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and ... 'take reasonable measures to guarantee the safety of the inmates.'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  Thus, a plaintiff must describe an objectively serious deprivation of a basic human need and that a prison official was deliberately indifferent to an inmate's health or safety to state a violation of the Eighth Amendment.  Id. at 834; Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993).  Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk.  Id. at 838.  "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

None of plaintiff's claims state a violation of the Eighth Amendment.  Plaintiff does not allege any significant physical or emotional injury resulting from any challenged condition.  See Strickler, 989 F.2d at 1381 (requiring an inmate to produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions to succeed on an Eighth Amendment claim).  Plaintiff also does not allege an objectively serious deprivation of a basic human need.  Plaintiff does not have any Eighth Amendment right to a personal television; to shave thrice weekly; to have a ventilated cell door made of wire mesh or steel bars; to be housed

10

in a particular B-3 cell; to not kneel when shackled in a shower, recreation cage or strip-cell cage; and to not be briefly placed in ambulatory restraints while escorted throughout the prison. Plaintiff has access to a toilet, and the mere fact that prison staff, and not a Level-S inmate, can flush it does not violate the Eighth Amendment. The lack of electricity, a shelf, or a desk in a B-3 cell is not a deprivation of a basic human need. Being fed the VDOC's Diet Loaf is not cruel and unusual punishment. See, e.g., Johnson v. Shear, No. 7:10-cv-00381, 2011 U.S. Dist. LEXIS 98550, at *17, 2011 WL 3880949, at *6 (W.D. Va. Sept. 1, 2011) (Kiser, J.) (collecting cases holding that the Diet Loaf does not violate the Eighth Amendment). Plaintiff's description of smelling foul odors for the brief time he is in the ventilated strip search cage does not implicate the Eighth Amendment. See, e.g., Burgos v. Canino, 641 F. Supp. 2d 443, 460 (E.D. Pa. 2009) ("There is no case precedent awarding a prisoner judicial relief under the Eighth Amendment for having to temporarily endure a bad odor."). Wearing clothing with different stripes than other Level-S inmates is also not an Eighth Amendment violation. See, e.g., Williams v. Ozmint, 726 F. Supp. 2d 589, 593-94 (D.S.C. 2010) (making some inmates wear pink jumpsuits is not cruel and unusual punishment). Plaintiff's segregation for eleven years while having access to clothing, food, shelter, medical care, outdoor recreation, television programming, and showers does not constitute cruel and unusual punishment. See, e.g., In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472 (4th Cir. 1999). Plaintiff's general fear of contracting an illness from the prison barber's tools because they are not sterilized long enough is also not sufficient to state an Eighth Amendment claim. See, e.g., Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) (finding that fear and emotional distress suffered from contemplating the risk of contracting AIDS or any other communicable disease fails to state an Eighth Amendment claim); Lee v. Tillman, Civil

11

Action No. 04-0823-WS-C, 2006 WL 2715127, at *4 (S.D. Ala. Sept. 22, 2006) (stating that

mere allegations of exposure to AIDS, tuberculosis, hepatitis, and staphylococcus bacteria absent

actual, subsequent illness fail to state a constitutional claim).[6] Accordingly, plaintiff fails to state

a violation of the Eighth Amendment, and defendants are entitled to qualified immunity for these

claims.

E. PLAINTIFF DOES NOT DESCRIBE A VIOLATION OF THE FOURTH AMENDMENT FOR CLAIMS ABOUT
   STRIP SEARCHES NOT INVOLVING FEMALE STAFF.

Plaintiff argues that the frequency of the strip searches, possibly two to four times per

day, is unreasonable because they occur after personnel visually search him in a cell and frisk

him once in the officer's physical presence. Plaintiff also complains that a strip search after a

shower is unreasonable because security staff watch him while he showers.

The Fourth Amendment guards against unreasonable searches and seizures. U.S. Const.

amend. IV. While the Fourth Amendment applies to lawfully confined prisoners, inmates have

much more limited privacy interests than those not incarcerated. Bell v. Wolfish, 441 U.S. 520,

---

[6] Plaintiff cursorily remarks that these conditions in B-3 also impose atypical and significant hardships in relation to the ordinary incidents of prison life. Plaintiff ostensibly attempts to invoke due process protections afforded by the Fourteenth Amendment, but he may not state a claim by relying on buzzwords, labels, or conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Moreover, the challenged conditions in B-3 do not present an atypical, significant hardship. See, e.g., Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997) (holding that administrative segregation for six months with vermin; human waste; flooded toilet; unbearable heat; cold food; dirty clothing, linens, and bedding; longer periods in cell; no outside recreation; no educational or religious services; and less food was not so atypical as to impose significant hardship). See also Sandin v. Conner, 515 U.S. 472, 486-87 (1995) (holding custodial classifications do not create a major disruption in a prisoner's environment). Plaintiff's inability to earn good time credit does not constitute cruel and unusual punishment and does not implicate any liberty interest. See Luken v. Scott, 71 F.3d 192, 193-94 (5th Cir. 1995) (citing Meachum v. Fano, 427 U.S. 215, 229 n.8 (1976)) (holding the effect of a classification reduction on the ability to earn good-time credits is too speculative to constitute a deprivation of a protected liberty interest); DeBlasio v. Johnson, 128 F. Supp. 2d 315, 329 (E.D. Va. 2000) (holding inmates have no protected liberty interest in earning a specific rate of good conduct time), aff'd, 13 F. App'x 96 (4th Cir. 2001); Hamm-Bey v. Johnson, No. 7:05-cv-00559, 2005 U.S. Dist. LEXIS 45899, at *5-6, 2005 WL 2563029, at *2 (W.D. Va. Oct. 11, 2005) (Turk, J.) (holding an inmate's move to a new security level and the coinciding limit to an inmate's potential to earn good conduct credit does not implicate a liberty interest). See also Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (holding due process is required when state officials transgress a liberty or property interest).

12

545-46 (1979); Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981). A prison regulation that encroaches on an inmate's Fourth Amendment right "is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 85. Thus, I must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559 (citations omitted). I must give considerable deference to prison officials' administrative decisions that promote institutional security and discipline. Id. at 547-48.

I find that the frequency of the strip searches plaintiff describes is reasonable to prevent a Level-S inmate, who admittedly stabbed a correctional officer multiple times with a shank, from possessing contraband. Nothing in the record supports the conclusion that ROSP officials' policy of conducting a visual strip search when a Level-S inmate enters or leaves a cell is an exaggerated response because these searches serve a legitimate penological purpose to dissuade and discover the secretion of contraband or weapons when an inmate is outside his cell. See, e.g., Florence v. Bd. of Chosen Freeholders, __ U.S. __, 132 S. Ct. 1510 (2012) (recognizing the important role visual strip searches serve in ensuring prison security and safety); Rickman v. Avaniti, 854 F.2d 327 (9th Cir. 1988) (approving strip searches each time a prisoner in administrative segregation left his cell). The visual strip search procedure used on all Level-S inmates allows officers to check for contraband on or in the inmate without resorting to more costly X-rays or dangerous physical contact. The benefits of conducting the strip search in the cage rather than solely in the cell are that more officers can more clearly see the inmate during the search. The small window on ROSP's cell doors limit what one correctional officer can see or hear during the search, whereas the cage permits multiple officers to stand in front and to the side of the inmate and see the inmate's entire unobstructed body. The fact that the visual strip

search occurs in a more "public" area monitored by password-protected video cameras than a segregation cell does not alone establish unreasonableness. See, e.g., United States v. Edwards, 666 F.3d 877, 883 (4th Cir. 2011) (holding that the fact a strip search was conducted in the middle of a public, residential street was not sufficient to overcome other Bell factors to conclude the strip search did not violate the Fourth Amendment). The fact that male correctional personnel may observe a strip search is of little consequence. See, e.g., Lawrence v. O'Brien, No. 7:08-cv-00022, 2008 U.S. Dist. LEXIS 41546, at *16-17, 2008 WL 2199275, at *5 (W.D. Va. May 27, 2008) (Turk, J.) (recognizing no Fourth Amendment violation occurs when male correctional officers conduct a visual strip search of a male inmate). Accordingly, defendants are entitled to qualified immunity for these claims.

## F. PLAINTIFF DOES DESCRIBE A VIOLATION OF THE FOURTH AMENDMENT FOR CLAIMS ABOUT STRIP SEARCHES WITH FEMALE STAFF PRESENT.

Plaintiff argues that Clarke, Johnson, Garman, Ray, and Rowlette are liable under the Fourth Amendment because they created a policy or practice authorizing strip searches in the cage where female staff consequently observed plaintiff's strip searches. Plaintiff also argues that Turner, Tate, Gilbert, and Wright are liable because they allowed female staff to observe his strip searches in the cage as follows: Wright and Tate strip searched plaintiff on February 2, 2011, while around twenty correctional officers, including "one or two" female officers, watched; male and female staff walked past plaintiff when Gilbert conducted a strip search on February 3, 2011; and a female counselor watched Turner and Tate conduct plaintiff's strip search on June 17, 2011. (Am. Compl. ¶¶ 54, 58, 69.) Plaintiff also alleges that female staff observed plaintiff in the cage without defendants' involvement as follows: a female sergeant was present during plaintiff's strip search on June 2, 2011; a female correctional officer was in an

14

office near the cage during plaintiff's strip search on June 10, 2011; a female staffer was in B-3 during the strip search on June 13, 2011; and two female staff were present during plaintiff's strip search on July 7, 2011. (Id. ¶¶ 62, 65-66, 68.) Plaintiff further alleges that female security staff in the B-3 control tower, which is approximately twenty feet from the strip-cell cage, would blush when plaintiff looked at them during his strip searches between February and May 2011, but he does not allege that any defendant was aware of female staff in the control tower watching the strip searches.[7] (Id. ¶ 75.)

Clearly established law in the Fourth Circuit maintains that undressed inmates are not to be viewed by prison staff of the opposite sex when not reasonably necessary. See Lee v. Downs, 641 F.2d 1117, 1120-21 (4th Cir. 1981) (finding "reasonably necessary" to include responding to an exigent circumstance, like male officers extinguishing a fire in a naked woman's cell). Even "[m]ale prisoners are . . . entitled to judicial protection of their right of privacy denied by the presence of female guards stationed in positions to observe the men while undressed or using toilets." Id. at 1120. See Canedy v. Boardman, 16 F.3d 183, 187 (7th Cir. 1994) (cross-gender strip searches of inmates or regular exposure of nude inmates to guards of the opposite sex violates inmates' privacy rights).

Nothing in the record presently addresses why the female administrative and security staff were present in the pod or watching plaintiff's strip search or whether their presence was a routine or an isolated incident. See Timm v. Gunter, 917 F.2d 1093 (8th Cir.1990) (distinguishing between minimal and constant, intrusive cross-gender observation). Plaintiff alleges that both male and female staff were in B-3 on February 2 and 3 and June 17, 2011, which could indicate that male staff were present without a reasonable need for female staff to be

---

[7] Plaintiff does not allege any Fourth Amendment claims involving female staff against Reynolds or McCoy.

watching plaintiff's routine strip searches. Viewing the perspectives most favorably to plaintiff, plaintiff describes a violation of the Fourth Amendment when plaintiff observed female staff watching his strip searches without reasonable necessity. See Jonathan Lee X v. Braden, No. 91-6335, 1994 U.S. App. LEXIS 20669, at *8-10, 1994 WL 410888, at *3 (4th Cir. 1994) (finding the plaintiff's allegation that a female officer watched his strip search is a matter within his personal knowledge and is sufficient to state a claim for relief). Nevertheless, plaintiff must relate the female staff's observations to some personal act or omission by defendants.

1. Plaintiff fails to state a claim of supervisory liability against Clarke, Johnson, Garman, Ray, and Rowlette for female staff observing his strip searches.

A supervisor may be liable for a constitutional deprivation "where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights[,]" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1997), or a subordinate acted pursuant to official policy or custom to cause the deprivation, Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). To hold a supervisor liable for a subordinate's act, plaintiff must show that: 1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Id. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978) (holding supervisory liability under § 1983 may not be predicated on the theory of respondeat superior). To satisfy the requirements of the first element, a plaintiff must establish: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive

16

and unreasonable risk of constitutional injury to the plaintiff. <u>Slakan v. Porter</u>, 737 F.2d 368, 373 (4th Cir. 1984). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. <u>Id.</u> at 373-74.

Nothing in the record supports supervisory liability claims under <u>Shaw</u> against Clarke, Johnson, Garman, Ray, and Rowlette. Plaintiff does not specifically describe a policy or practice but merely relies on <u>res ipsa loquitur</u> to conclude that such a policy or practice exists. <u>See</u> <u>Twombly</u>, 550 U.S. at 555 (requiring a basis for relief to consist of more than labels and conclusions). Furthermore, plaintiff does not allege that female staff observed plaintiff's strip searches pursuant to Clarke, Johnson, Garman, Ray, or Rowlette's policy or practice. Moreover, plaintiff does not allege that Clarke, Johnson, Garman, Ray, or Rowlette were aware that any female staff ever watched plaintiff's strip searches or that male staff permitted female staff to observe the searches. Notably, plaintiff does not allege that Clarke, Johnson, Garman, Ray, and Rowlette's policy or practice either required or encouraged female staff to watch strip searches in B-3. Finally, plaintiff does not sufficiently allege that Clarke, Johnson, Garman, Ray, or Rowlette personally deprived plaintiff of a civil right. <u>See id.</u> (same). Accordingly, Clarke, Johnson, Garman, Ray, and Rowlette are entitled to qualified immunity for these claims.

2. <u>Plaintiff states claims of bystander liability against Turner, Tate, Gilbert, and Wright for allowing female staff to observe plaintiff when Turner, Tate, Gilbert, and Wright conducted strip searches.</u>

A correctional officer may be liable on a theory of bystander liability if the officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>Randall v. Prince George's Cnty.,</u>

Md., 302 F.3d 188, 204 (4th Cir. 2002). See Willis v. Oakes, 493 F. Supp.2d 776, 784 (W.D. Va. 2007) (noting a plaintiff must prove a violation of a constitutional right as a prerequisite to establishing bystander liability). Viewing inferences in a light most favorable to plaintiff, Turner, Tate, Gilbert, and Wright would have been aware that female staff were present in B-3 and observing plaintiff's strip searches on February 2 and 3 and June 17, 2011, in violation of the Fourth Amendment, and that Turner, Tate, Gilbert, and Wright could have reasonably prevented the harm by delaying the strip search until female staff left the area or moved to the right side of the cage where plaintiff's genitals were hidden from view. See Randall, 302 F.3d at 204 n.23 (recognizing bystander liability is not limited to excessive force claims). Based on the liberal construction and perspectives presently afforded to plaintiff and the current absence of a reasonable necessity for female staff to be present, plaintiff's claims of bystander liability against Turner, Tate, Gilbert, and Wright are sufficient to overcome defendants' defense of qualified immunity.

## IV.

For the foregoing reasons, I deny defendants' motion for summary judgment as to plaintiff's Fourth Amendment claims for bystander liability against Turner, Tate, Gilbert, and Wright for strip searches on February 2 and 3 and June 17, 2011, with female staff present and grant the motion as to all other claims. The remaining defendants are directed to file within forty-five days a motion for summary judgment supported by affidavits addressing any affirmative defense and the merits of plaintiff's remaining Fourth Amendment claims. Plaintiff shall inform counsel for defendants, not the court, within ten days of this Order what specific personal property from his possessions at ROSP is relevant to the remaining Fourth Amendment claims and is necessary to respond to defendants' forthcoming motion for summary judgment.

Defendants should endeavor to provide some type of reasonable access to the specific, related material, and plaintiff should endeavor to access legal resources at his present place of confinement. I note that sanctions will result if plaintiff does not proceed in good faith and instead proceeds in a manner that is vexatious or malicious. Plaintiff's motion for an order to transfer property is dismissed without prejudice.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

**ENTER**: This 18th day of March, 2013.

Senior United States District Judge